IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | | |
|---|---|---|
| ROGER A. SALVATORA, SANDRA E. SALVATORA, D&M MARBURGER FAMILY ENTERPRISES, L.P., HEASLEY'S NURSERIES, INC., RODNEY L. LANG, BONITA A. LANG, INDIVIDUALLY AND ON BEHALF OF ALL THOSE SIMILARLY SITUATED; | ) ) ) ) ) ) ) ) ) | Civil Action No.: 2:19-CV-01097-WSS-CBB  William S. Stickman, IV United States District Judge  Christopher B. Brown United States Magistrate Judge |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| XTO ENERGY INC., | ) ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
ON ECF Nos. 240, 243, 246, 248, 250, 252**

**Christopher B. Brown, United States Magistrate Judge.**

## I.    Recommendation

The District Court certified two claims, Counts II and III of the Third

Amended Complaint, for class treatment.  ECF No. 173.  This certified class action

was initiated by Plaintiffs, a group of individuals who are leaseholders of oil and gas

leases with Defendant XTO Energy Inc ("XTO").  In their certified claims, Plaintiffs

allege XTO breached their leases by underpaying royalties in two ways, by

deducting inflated post-production costs from royalties (Count II) and by deducting

post-production costs from royalties after the gas products were in marketable form

(Count III). *Id.*

Presently before the Court are the following cross motions for summary judgment and motions to exclude or limit expert opinion testimony:

1. Plaintiffs' motion for summary judgment ECF No. 240;

2. XTO's motion for summary judgment ECF No. 243;

3. XTO's motion to exclude certain of John Burritt McArthur's opinions ECF No. 246;

4. XTO's motion to exclude Barry Pulliam's opinions ECF No. 248;

5. Plaintiffs' motion to exclude portions of Kris L. Terry's opinions ECF No. 250; and

6. Plaintiffs' motion to exclude portions of Lesa S. Adair's opinions ECF No. 252.

The motions are fully briefed and ripe for consideration. ECF Nos. 241, 257, 260 (Plaintiffs' motion for summary judgment); ECF Nos. 245, 256, 262 (XTO's motion for summary judgment); ECF Nos. 247, 249, 251, 253, 265-267, 269-273, (motions to exclude expert opinions).

This Court has subject matter jurisdiction under 28 U.S.C. § 1332.

For the reasons that follow, it is respectfully recommended that the Court deny Plaintiffs' motion for summary judgment, grant XTO's motion for summary judgment in its entirety and deny all pending challenges to expert testimony as moot.

II.    **Report**

a.  **Background**

**XTO's Natural Gas Production in Western Pennsylvania**

The claims in this case involve industry-specific processes which warrants an introductory overview of how natural gas is produced and ultimately delivered to the end user under the class leases.

To begin, Plaintiffs have oil and gas interests on their properties in Butler County, Pennsylvania.  ECF No. 79 at 2-3, 5-15.  They entered into oil and gas leases which permits XTO to develop and produce natural gas from individual wells located on their properties in exchange for royalty payments from the sale of the natural gas. ECF No. 168 at 3.

After XTO collects the gas from the individual wells, it moves it through a network of pipelines to a central location, often a processing facility or plant. *Id*.  In industry parlance, this process is referred to as "gathering." *Id*.  XTO does not perform this "gathering" process, but outsources it to its wholly owned subsidiary, Mountain Gathering, LLC under a "Gas Gathering Agreement" between the entities. ECF No. 79 at ¶ 61.  Mountain Gathering operates a gathering pipeline system which gathers the natural gas produced from the class members' wells on three relevant gathering segments: the Jefferson, Forward and AK Steel gathering segments. *Id*.

Once the gas moves through the pipeline to the Mountain Gathering segments it is commingled, or mixed together, with all the gas produced from other

wells connected to the segment. ECF No. 168 at 25-26. The gas is then commingled with gas from other segments and transported to and processed by Mountain Gathering at its PennCryo processing plant. ECF No. 255-1 at p. 14 ¶ 13; ECF No. 258 at p. 5 ¶ 2. If the PennCryo plant is at capacity, the gas is then processed at the Bluestone processing plant, a third-party processing plant operated by MarkWest Liberty Midstream & Resources, LLC ("MarkWest"). ECF No. 255-1 at p. 14 ¶ 13; ECF No. 258 at p. 5 ¶ 4.

"Processing" is a method of separating the natural gas liquid (or "wet" gas), from residue gas ("dry" gas). ECF No. 243-2 at pp. 83-84. To separate or process the gas, massive compressors at the PennCryo (or Bluestone) plant extract the "heavier" components of the gas steam by significantly lowering its temperature so that components transition into liquids and "fall out" of the gas stream. ECF No. 258 at ¶ 3. These extracted heavier components are referred to as "raw make" or "Y-grade" natural gas liquids ("NGLs"). *Id.* The remaining gas (stripped of the NGLs) is called "residue gas." *Id.*

The residue gas, which is methane or home heating gas, is delivered into a mainline pipeline on which XTO incurs transportation costs. ECF No. 243-2 at p. 84 ¶ 7; ECF No. 255-1 at 15. The residue gas is then sold to multiple purchasers downstream on the natural gas mainline pipeline systems. ECF No. 243-2 at p. 84 ¶ 7. XTO maintains the transportation costs it incurs to ship the residue gas stream on the pipelines are incurred prior to XTO's point of sale for the residue gas product. *Id.*

4

The NGLs are further transported to the Bluestone Fractionation facility[1], a third-party fractionation plant operated by MarkWest where the NGLs are further broken down into "individual purity products" like ethane, propane, butane, natural gasoline and heavier hydrocarbons for end consumers. ECF No. 243-2 at p. 85 ¶ 9; ECF No. 258 at ¶ 5. This process is referred to as "fractionation" and XTO incurs the cost to fractionate the NGLs. ECF No. 243-2 at p. 85 at ¶ 10; *see* Latham & Watkins LLP, The Book of Jargon, Oil & Gas, The Latham & Watkins Glossary to Oil and Gas Terminology (1st ed. 2016) at p. 44 (defining "fractionation" as "the process through which NGLs are separated into separate components . . . following [p]rocessing in order to meet commercial specifications."). XTO also incurs transportation costs to have these fractionated "purity products" transported further downstream from the Bluestone's fractionation plant where it sells the purity products to end-use purchasers and consumers. ECF No. 258 at ¶ 5. XTO maintains the fractionation and transportation costs it incurs to produce and transport these purity product NGLs are incurred prior to XTO's multiple downstream points of sale. ECF No. 243-2 at pp. 85-86 ¶10.

---

[1]    The Bluestone Fractionation facility is located at the Bluestone processing plant, so if the gas was processed at the Bluestone plant, the NGLs remains there for fractionation. ECF No. 243-2 at p. 85 ¶ 9.

This midstream process is illustrated below:



ECF No. 243-2 at p. 86.

XTO maintains it does not sell the residue gas or NGLs at the tailgate of the PennCryo or Bluestone plant. ECF No. 243-2 at pp. 86-87 ¶ 12.  Rather it sells these products at multiple points downstream from the tailgates of the PennCryo and Bluestone plants and all fractionation and transportation costs are incurred before the points of sale. *Id.*

### Class Oil and Gas Leases

The history between the class members and XTO involves a lengthy and complex course of dealings.  Because the remaining issues involve whether XTO breached the class members' leases, only the background necessary to make that determination is provided.

XTO is a wholly owned subsidiary of ExxonMobil and explores for and produces natural gas under oil and gas leases in Butler County, Pennsylvania. ECF No. 244 at ¶ 4.  Phillips Resources, Inc. obtained development rights through various oil and gas leases in Butler County ("Phillips leases"). *Id.*  In 2011,

ExxonMobil acquired Phillips Resources, Inc. and its affiliates and XTO has been responsible for operating the Phillips leases and paying royalties thereunder since that acquisition. *Id.*

Several named Plaintiffs entered into these Phillips leases which were then acquired by XTO and were members of the class certified in *Marburger v. XTO Energy, Inc.*, No. 2:15-cv-910-CRE (the "*Marburger* Settlement Class"). ECF No. 168 at 3. The Phillips leases did not explicitly permit XTO to deduct post-production costs from royalties and the *Marburger* Settlement Class challenged these deductions. *Id.* at 3-4. The parties ultimately settled and as a term of the settlement, the Phillips leases were modified to allow XTO to deduct post-production costs from their royalties. *Id.* at 4. The royalty provision was modified in the original Phillips leases as follows:

> XTO . . . shall make future royalty payments under the Settlement Class members' Phillips Standard Leases using the net-back royalty calculation methodology described in *Kilmer v. Elexco Land Services, Inc.*, 990 A.2d 1147 (Pa. 2010). Specifically, to the extent that post-production costs, including: (i) all losses of produced volumes (whether by use as fuel, line loss, flaring, venting or otherwise); (ii) all costs from and after the wellhead to the point of sale, including, without limitation, all gathering, dehydrating, compression, treatment, processing, marketing, and transportation costs incurred in connection with the sale of such production, are attributable to Settlement Class members' Phillips Standard Leases, the Settlement Class members will bear their proportionate share of such postproduction costs. . . .

ECF No. 72-1 at p. 7 ¶ 30 (the "Marburger leases"). The modified Marburger leases further defines "post-production costs" as "(ii) all costs from and after the wellhead to the point of sale, including, without limitation, all gathering, dehydration,

7

compression, treatment, processing, marketing, and transportation costs incurred in connection with the sale of such production." ECF No. 243-3 at pp. 223-224 ¶ 1.21. The Marburger leases also contain a discretionary clause which provides: "The time and method of producing, metering, delivering and selling gas produced from any well on the leased premises and the amount thereof that shall be used or sold within any period of time shall be entirely within the sole discretion of the lessee." ECF No. 244 at ¶ 23.[2]

Another subset of lessor-class members entered into leases with Phillips that did not include the royalty language at issue in the *Marburger* Settlement Class. Instead, these leases expressly allow XTO to deduct post-production costs from royalties and includes a "Market Enhancement" provision. The royalty provision of these leases provides:

> MARKET ENHANCEMENT: Notwithstanding anything to the contrary contained herein, it is agreed between the Lessor and Lessee that all oil and gas royalties accruing to the Lessor under this lease shall be net of Lessor's proportionate share of the cost of gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marking the oil, gas or other products produced hereunder to transform the product into marketable form.

ECF No. 244 at ¶ 36 (the "Phillips Market Enhancement leases"). The Phillips Market Enhancement leases also contain a discretionary clause which provides: "The time and method of producing, metering, delivering and selling gas produced from any well on the leased premises and the amount thereof that shall be used or

---

2    While this language appeared in the original Phillips leases, neither party maintains this language is not enforceable because of the *Marburger* Settlement Class lease modification.

sold within any period of time shall be entirely within the sole discretion of the lessee." *Id.*

### XTO's Operations in Western Pennsylvania and Post-Production Costs under Count II

In 2011-2012, XTO only operated a handful of wells in Butler County with plans to develop hundreds more wells in the Marcellus Shale formation under the Phillips leases and leases XTO itself had acquired. ECF No. 244 at ¶ 5. At that time, Butler County did not have an existing gathering and processing infrastructure capable of handling large volumes of gas that XTO anticipated producing and it began exploring options for post-production services like gas gathering and processing. *Id.* XTO sought but did not receive any proposals from third-party midstream companies for constructing and operating a wellhead-to-point-of delivery gathering system. *Id.* at ¶ 6.

XTO sought and received a few proposals from third parties to construct and operate a gas processing plant in the vicinity. *Id.* at ¶ 7. XTO also evaluated contracting with its affiliate, Mountain Gathering, to build and provide the necessary gathering and processing infrastructure and services. *Id.* at ¶ 8. Of the proposals to construct and operate a processing plant, XTO maintains only one unaffiliated company's proposal merited serious consideration: MarkWest. *Id.* at ¶ 9. XTO evaluated and compared the terms of MarkWest's processing proposal and Mountain Gathering's agreement terms and considered both proposals were "economically equivalent." *Id.* Plaintiffs dispute the MarkWest and Mountain

Gathering proposals were "economically equivalent" because MarkWest's proposed processing rate was 15% lower than Mountain Gathering's rate and XTO did not ask Mountain Gathering to match that lower processing rate. ECF No. 255 at ¶¶ 3, 54. XTO ultimately chose to use Mountain Gathering for processing because it "would afford XTO more control in determining when and where to drill wells, which would benefit both XTO and the lessor royalty owners." ECF No. 244 at ¶ 9.

XTO and Mountain Gathering negotiated terms and entered into a Gas Gathering Agreement in January 2013 for Mountain Gathering to collect gas "on a firm basis" (i.e., uninterruptible) from individual wells and move the gas downstream to receipt points. *Id*. at ¶ 10 (the "2013 Gas Gathering Agreement"). Mountain Gathering expended approximately $270 million to construct the three gathering system segments and related compression facilities relevant to this lawsuit. *Id*. at ¶ 11. Under the 2013 Gas Gathering Agreement, XTO agreed to pay Mountain Gathering a fee, calculated on a per MCF basis to gather, compress, and dehydrate the gas as well as transport it to downstream delivery points. *Id*. at ¶ 12 (the "gathering fee"). The agreement had an initial term of five years with subsequent annual renewals. *Id*. The gathering fee is adjusted annually based on the percentage change in the annual average in the Consumer Price Index ("CPI") in the preceding year. *Id*.

During this same time, Mountain Gathering spent around $70 million buying land and constructing the PennCryo processing plant. *Id*. at ¶ 13. In June 2013, XTO and Mountain Gathering amended the 2013 Gas Gathering Agreement to

include a processing fee for gas produced from wells and gathered on the Jefferson, Forward and AK Steel gathering segments, which is subject to the same annual CPI adjustment as the gathering fee. *Id.*  XTO maintains that through 2019, Mountain Gathering made more investments and expanded the capacity of the PennCryo plant and its gathering capabilities but did not increase the gathering or processing fees it charges, and those fees were only adjusted pursuant to the annual CPI rate adjustment provided in the agreement. *Id.* at ¶ 14.

The class members' leases allow XTO to deduct the lessor's share of gathering and processing fees incurred. *See* ECF No. 79 at ¶ 57.  The Count II subclass[3] maintains the gathering and processing fees Mountain Gathering charges to XTO are inflated above-market price by virtue of the affiliate relationship between the entities. *Id.* at ¶¶ 61-62.  Plaintiffs maintain MarkWest's proposed processing rate was 15% lower than the processing rate XTO agreed to pay Mountain Gathering and by 2018, because of the annual CPI rate adjustments, Mountain Gathering's processing rate was 19% higher than MarkWest's proposed processing rate. ECF No. 255 at ¶¶ 54-55.

Plaintiffs also rely on their expert, Barry Pulliam, to demonstrate the processing and gathering fees charged by Mountain Gathering exceeded industry standards for determining appropriate rates for post-production costs for services

---

[3]    The Court granted class certification as to Count II and defined the class as follows: "[e]very individual and entity who possessed a royalty ownership interest in an oil and gas lease with Phillips [and the listed Phillips-related entities] who was (1) either a member of the settlement class in Marburger, or (2) whose oil and gas lease based the royalty on a percentage of proceeds and contained a Market Enhancement Clause." ECF No. 173 at ¶ 1; ECF No. 79 at ¶ 78.

provided by a producer itself (like XTO) or its affiliate (like Mountain Gathering). *Id*. at ¶ 59.  One of these methods for determining appropriate post-production costs is the "cost-of-service" method. *Id*.  According to Mr. Pulliam, under this method, a rate is determined based on the producer or affiliate's cost to provide the service in question and the rate compensates the service provider for its operating costs, the capital invested in the relevant facilities and provides a return on that investment. *Id*. at ¶ 60.  Mr. Pulliam maintains the "cost-of-service" analysis is used in federal oil and gas leases and in gathering and/or processing agreements. *Id*. at ¶ 61.  Mr. Pulliam used the cost-of-service method to calculate gathering and processing rates he claims would be reasonable in industry practice. *Id*. at ¶¶ 62-64.  He calculated these rates based on costs actually incurred, including operating costs, taxes, capital investment and by factoring in a return on capital and concluded XTO deducted processing and gathering charges that exceeded the rates he calculated under the cost-of-service method. *Id*. at ¶¶ 62-63.

### XTO's Operations in Western Pennsylvania and Marketable Form under Count III

The claims asserted in the Count III subclass[4] relate to the Phillips Market Enhancement Clause leases which Plaintiffs maintain allow XTO to deduct post-

---

[4]    The Court granted class certification as to Count III and defined the class as follows:

Every individual and entity who possessed a royalty ownership interest in an oil and gas lease with Phillips covering oil and gas interests at any time during the period of limitations (a) who received one or more royalty payments from XTO; (b) whose oil and gas lease covered gas that was or is gathered by the Jefferson, Forward or AK Steel gathering segments of the Mountain Gathering system in Butler County, Pennsylvania, and (c) whose oil and gas lease based the royalty on a percentage of proceeds and contained a Market Enhancement Clause or an essentially identical

production costs from royalties until the gas product is in "marketable form." ECF No. 79 at ¶ 1; ECF No. 256 at 14.   The Phillips Market Enhancement Clause lease provides:

> MARKET ENHANCEMENT. Notwithstanding anything to the contrary contained herein, it is agreed between the Lessor and Lessee that all oil and gas royalties accruing to the Lessor under this lease shall be net of Lessor's proportionate share of the cost of gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas or other products produced hereunder to transform the product into marketable form.

ECF No. 256 at 14.  Plaintiffs maintain XTO deducted transportation and fractionation costs incurred after the residue gas and NGLs were in marketable form and thus breached the leases. ECF No. 256 at 17-18.

As for the residue gas, Plaintiffs maintain that after the gas from Plaintiffs' wells is processed at the PennCryo or Bluestone plants, the residue gas does not change form after the tailgate of the processing plant, is "pipeline ready for transportation to end users or for storage" and thus "marketable." ECF No. 256 at 17.  Plaintiffs therefore argue because XTO deducted transportation costs from royalties after the residue gas was in marketable form, they breached the leases. *Id.*

provision. A Market Enhancement Clause means an oil and gas lease provision that (i) states "Notwithstanding anything to the contrary contained herein, it is agreed between the Lessor and Lessee that all oil and gas royalties accruing to the Lessor under this lease shall be net of Lessor's proportionate share of the cost of gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas or other products produced hereunder to transform the product into marketable form." or that (ii) uses substantially identical language and incudes the words "marketable form."

ECF No. 79 at ¶ 79; ECF No. 173 at ¶ 2.

Plaintiffs maintain the NGLs are likewise in marketable form at the tailgate of the processing plant. *Id.*  Plaintiffs maintain XTO delivers the raw make NGL stream to MarkWest at the inlet of MarkWest's NGL pipeline connecting the PennCryo processing plant to MarkWest's fractionation facility but the NGLs do "not change form between the tailgate (end) of the PennCryo processing plant and the adjacent inlet flange for MarkWest's pipeline at or near the processing plant." ECF No. 255 at ¶¶ 68-69.  Plaintiffs assert XTO then transfers title to the NGLs to MarkWest at its inlet flange, who in return pays an agreed upon price for the NGLs. *Id.* at ¶¶ 70-71.

### b.  Standard of Review

The standard for assessing motions for summary judgment is well-settled. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court must ask whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

In making this determination, "all reasonable inferences from the record must be drawn in favor of the nonmoving party and the court may not weigh the evidence or assess credibility." *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (cleaned up).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson*, 477 U.S. at 247–48. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with respect to that issue. *Id.*

The summary judgment standard "does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987)). When both parties move for summary judgment, the court "must rule on each party's motion on an individual and separate basis," determining "whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (citing 10A Charles Alan Wright, *et al.*, *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

### c. Discussion

#### i. Plaintiffs' Motion for Summary Judgment on Count III ECF No. 240

To begin, the Court will start with Plaintiffs' partial motion for summary judgment which relates to Count III only and asks the Court to declare the Market Enhancement Clause unambiguous.

Count III relates to leases which include the Phillips Market Enhancement Clause which states:

> MARKET ENANCEMENT. Notwithstanding anything to the contrary contained herein, it is agreed between the Lessor and Lessee that all oil and gas royalties accruing to the Lessor under this lease shall be net of Lessor's proportionate share of the cost of gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas or other products produced hereunder to transform the product into marketable form.

15

ECF No. 256 at 14. Plaintiffs claim under the Phillips Market Enhancement Clause leases, XTO was only permitted to deduct post-production costs incurred until the gas products were transformed into marketable form. ECF No. 79 at ¶¶ 70-71; ECF No. 241 at 2. Plaintiffs assert the gas products were in marketable form at the tailgate of the processing plant. *Id*. Thus, according to Plaintiffs, XTO was required to pay royalties without deducting any transportation or other costs after the tailgate of the processing plant. Plaintiffs argue their leases were breached when XTO deducted costs incurred after the tailgate of the processing plant from Plaintiffs' royalties. *Id*.

Plaintiffs move for partial summary judgment on Count III and "request that this Court enter an Order stating that the Phillips Market Enhancement provision is unambiguous, and that defendant may not deduct any post-production costs after the gas product attains marketable form." ECF No. 241 at 5. XTO responds that Plaintiffs' request for summary judgment on this claim is improper because, *inter alia*, Plaintiffs effectively seek an advisory opinion that will not resolve this claim. ECF No. 257 at 18-21. XTO argues there is no evidence showing the gas products are in "marketable form" at the tailgates of the processing plants and Plaintiffs' limited request for summary judgment does not connect XTO to any liability. *Id*. at 18-24. Plaintiffs reply that their motion "does not raise any issue concerning when the products at issue obtain marketable form [because] that is an issue for trial." ECF No. 260 at 1.

Plaintiffs' theory supporting its claim that XTO breached the Market Enhancement provision has always been that the gas was in marketable form **at the tailgate of the processing plant** and because XTO deducted certain post-production costs from Plaintiffs' royalties incurred beyond the tailgate, it breached the leases.[5]  Indeed, that is the exact issue the Court certified for class treatment.[6] Plaintiffs now seek judgment in their favor for Count III on a theory that is either not dispositive of the claim, or perhaps broader than what the Court has certified for class treatment.

Plaintiff's theory of liability since this case's inception has been that XTO is only liable if gas is marketable at the tailgate of the processing plant, and XTO deducted post-production costs incurred after the gas left the tailgate.  Yet, deciding whether the Phillips Market Enhancement Clause leases are unambiguous and whether XTO can deduct post-production costs after the gas is marketable only gets Plaintiffs so far: to prevail Plaintiffs must also demonstrate the gas is marketable at the tailgate of the processing plant.  They provide no analysis to this point, but rather argue the issue of when the gas becomes marketable is an issue for trial – which undercuts any argument Plaintiffs are entitled to judgment as a matter of

---

[5]      *See* ECF No. 79 at ¶¶ 70-71 ("XTO was required to pay royalties without deducting any transportation or other costs **after the tailgate of the processing plant**.  XTO breached the [leases] . . . when it deducted transportation and/or other costs incurred **after the tailgate of the processing plant** in calculating royalties.") (emphasis added).

[6]      *See* ECF No. 168 at 31-32 ("Plaintiffs' theory is that **all gas at issue is 'marketable' at the tailgate of the PennCryo processing plant** . . . Under such a theory, Plaintiffs submit that a determination of when gas is first 'marketable' is immaterial.") and 37-38 ("Plaintiffs' claim under Count III relies on the legal theory that **all the putative class members' gas is marketable at the tailgate of the processing plant.**") (emphasis added) (adopted by ECF No. 171).

law on this claim. *See* Fed. R. Civ. P. 56(a) (summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  Nothing in Rule 56 "can be read to allow partial summary judgment on only one portion of a claim." *New Jersey Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 396 (D.N.J. 1998). *See also Coffman v. Fed. Lab'ys*, 171 F.2d 94, 98 (3d Cir. 1948) (Rule 56 "does not contemplate a summary judgment for a portion of a single claim in suit."); *Capo v. Pittsburgh Bd. of Pub. Educ.*, No. 2:04CV1473, 2007 WL 760513, at *4 (W.D. Pa. Mar. 8, 2007) (declining deciding summary judgment where it would result in a "hollow victory").

Even if the Court were to declare the Phillips Market Enhancement Clause unambiguous and declare XTO could not deduct costs after the gas becomes marketable, it would not dispose of Count III in its entirety, streamline any issues for trial or entitle Plaintiffs to judgment as a matter of law on that claim.  In other words, making those determinations have no impact on whether XTO is liable and whether it breached the leases.  Plaintiffs admit as such. ECF No. 260 at 9 ("Plaintiffs' Motion does not seek an order establishing liability under Count III.  To the contrary, it seeks an order holding that the Market Enhancement clause is unambiguous.").  Deciding whether the contract is unambiguous would not "affect the rights of litigants in the case" nor would it advance the litigation and would be an improper advisory opinion. *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 421 (3d Cir. 2013) (cleaned up).

That said, the contract interpretation issues raised by Plaintiffs are indeed relevant to this litigation – just not relevant in the context of whether Plaintiffs are entitled to judgment as a matter of law for Count III.  Plaintiffs are free to and indeed have raised these arguments in response to XTO's summary judgment motion and those arguments will be addressed in the appropriate context.

Accordingly, Plaintiffs have failed to meet their burden of demonstrating they are entitled to judgment as a matter of law for Count III and it is respectfully recommended the Court deny their motion.

### ii.  XTO's Motion for Summary Judgment ECF No. 243

XTO also moves for summary judgment, albeit in entirety on both Counts II and III, and does so for  myriad reasons.  Because it is recommended the Court grant summary judgment in favor of XTO in its entirety, only two core arguments which serve as the basis for that recommendation are addressed: (1) whether the implied duty of good faith imposes contractual terms the parties never agreed to under Count II, and (2) whether the leases permit the deductions at issue, or if there is adequate evidence supporting Plaintiffs' claims under Count III.

### 1.  Count II: Implied Duty of Good Faith and Unreasonable Deductions from Royalties

It is undisputed the class leases allow XTO to deduct the Plaintiffs' share of gathering and processing post-production costs from royalties. ECF No. 79 at ¶ 57; ECF No. 255 at ¶ 1.  In Count II, Plaintiffs claim that XTO breached the leases through the implied duty of good faith and fair dealing when it deducted above-

market gathering and processing costs that XTO's affiliate, Mountain Gathering, charged XTO. ECF No. 79 at ¶¶ 62, 64-66, 92-96.  Plaintiffs allege this affiliate relationship resulted in non-arms-length transactions and inflated gathering and processing costs that were passed along to Plaintiffs through the royalty deductions which were unreasonable and excessive. *Id.*

XTO argues it is entitled to summary judgment on Count II for several reasons: (1) there is no claim that XTO breached an express provision of the leases; (2) the leases expressly permit deductions of gathering and processing costs; (3) Pennsylvania law does not recognize an independent cause of action for breach of an implied duty of good faith and fair dealing; (4) Plaintiffs do not have a justifiable expectation of their bad faith claim under the plain language of the leases; and (5) even if there is an implied limitation on XTO's ability to deduct post-production charges, Plaintiffs have provided no evidence the charges were unreasonable. ECF No. 245 at 9-17.

### Breach of Contract – Implied Duty of Good Faith and Fair Dealing in Pennsylvania

XTO argues that Count II must be dismissed because Pennsylvania does not recognize an independent cause of action for breach of an implied duty of good faith and fair dealing.  ECF No. 245 at 7, 13-17.  In so arguing XTO submits that Plaintiffs' implied duty claim overrides the express terms of the lease and imposes additional obligations beyond those expressly stated. *Id.*  It is on this basis the Court recommends summary judgment be granted.

By way of background, oil and gas leases in Pennsylvania are treated as any other contract and in accordance with standard contract principles. *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 615 Pa. 199 (2012). A breach of contract requires the following elements: (1) existence of a contract, including its essential terms; (2) breach of a duty imposed by the contract; and (3) resulting damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 635 Pa. 427 (2016). "A plaintiff asserting a breach of contract claim bears the burden of proof concerning the elements of his claim and must establish them by a preponderance of evidence." *Tennant v. Range Res. - Appalachia, LLC*, 561 F. Supp. 3d 522, 533 (W.D. Pa. 2021), *dismissed,* No. 21-2946, 2022 WL 22955819 (3d Cir. June 21, 2022) (collecting cases). This burden is the same for oil and gas royalty payment disputes and therefore a plaintiff-lessor has the burden of proof notwithstanding that "information pertaining to price, value, or proceeds, of the [lessor's] share of production may be more readily available to the [defendant-lessee] than to the [plaintiff-lessor]." *Id.* (quoting 3 *Williams & Meyers, Oil and Gas Law* § 650.3 (2020) (cleaned up)). *See accord. Slamon v. Carrizo (Marcellus) LLC*, 654 F. Supp. 3d 405, 423 (M.D. Pa. 2023), *aff'd sub nom. Slamon v. Carrizo (Marcellus) L.L.C.*, No. 23-1394, 2024 WL 4602673 (3d Cir. Oct. 29, 2024).

Every contract imposes upon each party a duty of good faith and fair dealing in its performance of their contractual obligations. Restatement (Second) Contracts

§ 205.  While the Pennsylvania Supreme Court has not explicitly[7] adopted section 205, Pennsylvania intermediate appellate courts and federal courts applying Pennsylvania law have consistently predicted it would do so, and so does this Court. *See Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa.Super.Ct. 2005); *Herzog v. Herzog*, 887 A.2d 313, 317 (Pa.Super.Ct.2005); *Palmieri v. Partridge*, 853 A.2d 1076, 1079 (Pa.Super.Ct.2004); *W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 170 (3d Cir. 2013); *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000).  Therefore, the leases required both Plaintiffs and XTO to perform their obligations under the lease in good faith. *See e.g.*, *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 626 (W.D. Pa. 2013).

While the implied duty of good faith is imposed in all contracts, it "is not limitless.  Rather, there must be some relationship to the provisions of the contract itself to invoke the duty of good faith." *W. Run Student Hous. Assocs., LLC*, 712 F.3d at 170 (cleaned up). *See also Northview Motors, Inc.*, 227 F.3d at 91 (good faith duty can be used as an "interpretive tool" to "color" and "determine the parties' justifiable expectations in the context of a breach of contract action").  The implied duty of good faith serves as a gap-filler and arises only "when there are no express terms in the contract relating to the particular issue." *Benchmark Grp., Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 584 (E.D. Pa. 2009).  Similarly, an implied good faith duty claim cannot "override an express contractual term," *Northview Motors, Inc.*, 227

---

[7]    *Ash v. Cont'l Ins. Co*., 932 A.2d 877, 883 n. 2 (Pa. 2007) ("Despite the apparent conflict over the applicability of the implied duty of good faith, we decline to engage in a discussion of this issue as it is not presently before us.")

F.3d at 91, and "does not license courts to interpose contractual terms to which the parties never assented." *W. Run Student Hous. Assocs., LLC*, 712 F.3d at 170. *See also Hordis v. Cabot Oil & Gas Corp.*, No. 3:19-CV-296, 2020 WL 2128968, at *5 (M.D. Pa. May 5, 2020) (the implied duty cannot impose any "further obligations beyond those expressly articulated in the contract."); *Slamon v. Carrizo (Marcellus) LLC*, 654 F. Supp. 3d 405, 438 (M.D. Pa. 2023), *aff'd sub nom. Slamon v. Carrizo (Marcellus) L.L.C.*, No. 23-1394, 2024 WL 4602673 (3d Cir. Oct. 29, 2024) (same).

XTO first argues Pennsylvania does not recognize an "independent" claim for breach of the implied duty of good faith. ECF No. 245 at 14. While technically correct, our inquiry does not end here, and a more nuanced discussion is warranted. Pennsylvania requires an implied duty of good faith claim be tethered to an express contractual provision of a valid contract. *Cessna v. REA Energy Coop., Inc.*, 258 F. Supp. 3d 566, 585 (W.D. Pa. 2017). Otherwise, the claim is "independent" and only recognized in Pennsylvania in a very narrow set of circumstances that do not apply here.[8] *See Creeger Brick & Bldg. Supply Inc.*, 560 A.2d 151 at 153. Judge Gibson of this Court aptly recognized the implied contractual duty of good faith as a "legal concept shrouded in mystery and confusion in Pennsylvania." *Cessna*, 258 F. Supp. 3d at 585. He explained: "[i]t appears most of the confusion surrounding the applicability of the covenant stems from the conflation of two distinct questions, namely (1) whether the covenant applies to a contract, and (2) whether the covenant

---

[8] This includes in relationships involving franchisors and franchisees, insurer and insured and in limited employment relationships. *See Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Tr. Co.*, 560 A.2d 151, 153 (Pa.Super.Ct. 1989).

supports a claim (be it as an independent claim or as a breach of contract)." *Cessna*, 258 F. Supp. 3d at 585.

XTO argues "courts routinely reject claims for breach of the duty of good faith and fair dealing in oil and gas lease disputes, reasoning that 'Pennsylvania does not recognize a separate cause of action for breach of an implied duty of good faith and fair dealing in oil and gas leases.'" ECF No. 245 at 14 (quoting *Chambers v. Equinor USA Onshore Props. Inc.*, No. 3:18-CV-00437, 2024 WL 4109340 at *9 (M.D. Pa. Sept. 6, 2024)). But this principle only applies in narrow circumstances which are absent here. The case law XTO relies upon involves the principle that Pennsylvania does not recognize a separate or "independent" good faith claim when the claim is subsumed by a separately pleaded breach of contract claim based on the same conduct. *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011). In other words, when a plaintiff asserts two separate claims based on the same conduct – one for an express breach of contract, and another for implied duty of good faith – the good faith claim is deemed redundant (and likely dismissed) and is analyzed instead under the express breach of contract claim. *See Simmons*, 788 F. Supp. 2d at 409; *King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 158 F. Supp. 2d 463, 467 (E.D. Pa. 2001), *aff'd,* 117 F. App'x 173 (3d Cir. 2004); *Chambers*, 2024 WL 4109340, at *9 (granting summary judgment for breach of implied duty of good faith and fair dealing of oil and gas lease because the conduct alleged was subsumed in plaintiff's breach of contract claim); *Tracy v. PNC Bank, N.A.*, No. 2:20-CV-1960, 2024 WL 665227, at *6 (W.D. Pa. Feb. 16, 2024); *Slamon v. Carrizo (Marcellus)*

24

*LLC*, No. 3:16-CV-2187, 2017 WL 3877856, at *8 (M.D. Pa. Sept. 5, 2017); *Smith v. Allstate Ins. Co.*, 904 F. Supp. 2d 515, 522 (W.D. Pa. 2012).

On this point, Plaintiffs respond they assert a breach of contract claim and not an independent duty of good faith claim with respect to whether XTO deducted excessive post-production costs. ECF No. 256 at 7. Plaintiffs characterize the issue as "whether XTO breached the specific royalty provision contained in the class members' oil and gas lease." ECF No. 256 at 7. This reasoning also reflects a misunderstanding of how the implied duty of good faith applies in this context. It is undisputed there is no express breach of contract claim in this case. In other words, Plaintiffs do not (and cannot) allege XTO breached any express provisions of the leases related to Count II. That said, Plaintiffs' implied duty of good faith claim does not fail merely because they do not allege an express breach of the leases. Instead, the gravamen of Plaintiffs' claim in Count II is that XTO performed under the leases in bad faith by transacting with its affiliate to set above-market prices for post-production costs. ECF No. 79 at ¶¶ 62, 64-66, 92-96. Because there is no express contractual term addressing affiliate transactions or how to calculate prices for post-production costs, such a claim is properly analyzed under the implied duty of good faith. This distinction may be semantics, because when there is a valid contract, a breach of the implied duty of good faith is in essence a breach of contract claim.[9] *Walkup v. Santander Bank, N.A.*, 147 F. Supp. 3d 349, 363 (E.D. Pa. 2015)

---

[9]    A breach of the good faith duty requires a showing that in the performance of its obligations a party, for example, evaded the spirit of the bargain, lacked diligence or slacked off, willfully

(the elements of an implied duty of good faith claim requires a showing of (1) the existence of a contract; (2) "a breach of the duties imposed by the covenant of good faith and fair dealing implied in that contract"; and (3) resultant damages). In any event, Plaintiffs' implied duty claim is not "independent" merely because it does not involve an express breach of a lease provision.[10]

Separately, an implied duty of good faith claim may be considered "independent" – as XTO posits – when the conduct complained of is untethered from an express contractual provision. While all parties to a contract must perform their obligations in good faith, this "duty is not limitless." *W. Run Student Hous. Assocs., LLC*, 712 F.3d at 170. The implied duty of good faith cannot supplant or nullify express contractual terms, nor can it impose obligations for which the parties did not bargain for. *Id. See also Hordis*, 2020 WL 2128968 at *5.

First, it appears XTO takes the position that Plaintiffs' implied duty of good faith claim nullifies the express lease language. ECF No. 245 at 12. The royalty provisions of the two leases at issue provide:

- Lessors "will bear their proportionate share" of "all [post-production] costs from and after the wellhead to the point of sale, including, without limitation,

---

rendered imperfect performance, abused power to specify favorable terms, or interfered with the other party's performance. *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa.Super.Ct. 1992) (citing Restatement (Second) of Contracts § 205(d)). The linchpin is often conduct that deprives another of substantially all the benefits to which he was entitled under the contract and renders the contract meaningless. *Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*, 779 F. Supp. 2d 416, 430 n. 12 (E.D. Pa. 2011); *Liberty Fencing Club LLC v. Fernandez-Prada*, No. CV 17-0180, 2017 WL 3008758, at *8 (E.D. Pa. July 14, 2017).

[10]   Requiring an express breach of a contractual provision as an element of an implied good faith claim would effectively nullify the implied covenant.

all gathering, dehydration, compression, treatment, processing, marketing, and transportation costs incurred in connection with the sale of such production." ECF No. 244 at ¶¶ 30-31 (Marburger leases).

- "[A]ll oil and gas royalties accruing to the Lessor under this lease shall be net of Lessor's proportionate share of the cost of gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas or other products produced hereunder to transform the product into marketable form." ECF No. 244 at ¶ 36 (Phillips Market Enhancement leases).

Additionally, both leases include a "discretionary" clause that grants XTO "the sole discretion" to decide "[t]he time and method of producing, metering, delivering and selling the gas produced from any well on the leased premises." ECF No. 244 at ¶¶ 26, 33.

The parties spill much ink arguing whether the term "all" in relation to XTO's ability to deduct "all" post-production costs in the leases are ambiguous and rehashing the Marburger class action settlement negotiations.[11] *See* ECF No. 245 at 9-13; ECF No. 256 at 5-7. Whether the term "all" is ambiguous is not material to this discussion, as explained *infra*. Nevertheless, the Court will address this argument.

"A contract is ambiguous if it reasonably susceptible of different constructions and capable of being understood in more than one sense. . . . A mere difference in interpretation, however, does not render a contract ambiguous." *Chambers v. Chesapeake Appalachia, L.L.C.*, 359 F. Supp. 3d 268, 275 (M.D. Pa.

---

[11] The court does not consider extrinsic evidence when a contract's language is clear and unambiguous. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92–93 (3d Cir. 2001) (applying Pennsylvania law).

2019) (cleaned up).  The royalty provisions are capable of only one reasonable meaning: Plaintiffs must pay their proportionate share of all post-production costs incurred by XTO.  Peeling away the layers of the parties' arguments, it does not appear that either party materially disputes this conclusion. *Compare* ECF No. 256 at 6 (Plaintiffs maintain they "do not challenge XTO's general ability to deduct processing and gathering costs.  The dispute is whether the amount XTO deducts for gathering and processing are excessive."); *with* ECF No. 245 at 3 (XTO maintains it is expressly permitted to deduct gathering and processing costs it incurs).

Rather, XTO argues the "all" costs language coupled with the "without limitation" language "demonstrates the parties' intent that XTO will be entitled to share post-production costs, including those for processing and gathering services that Mountain Gathering provides" and the leases grant XTO "the sole discretion" to decide the means of production and sale. ECF No. 245 at 10, 12.  Plaintiffs respond in part that the word "all . . . does not grant XTO unfettered discretion to deduct any amount for post-production costs." ECF No. 256 at 7.  These arguments are broadcasting on different frequencies.  XTO is correct that the leases unambiguously grant it the right to deduct all post-production costs incurred and grant it the sole discretion to determine the means of production and sale.  But, how XTO should exercise this discretion and calculate post-production costs are not expressly provided for in the leases.  In other words, just because a contract grants a party sole discretion does not mean that discretion can be exercised in bad faith.

*See Burke v. Daughters of the Most Holy Redeemer, Inc.*, 26 A.2d 460, 461 (Pa. 1942); *Haywood*, 976 F. Supp. 2d 606 (applying Pennsylvania law). Instead, in such instances, the implied duty of good faith is invoked as a gap filler to determine the parties' reasonable justifications. *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir. 1993). Here, the express lease language gives XTO the right to deduct all post-production costs it incurs from royalties and the sole discretion to decide how those costs are incurred. But, XTO still must act in good faith when it calculates royalties or exercises its discretion, and Plaintiffs' implied duty claim does not override those express contractual provisions.

Next, XTO argues Plaintiffs' implied duty of good faith claim imposes terms the parties did not bargain for. ECF No. 245 at 14-17. Again, the gravamen of Plaintiffs' implied duty claim is that XTO can "only deduct reasonable" post-production costs. ECF No. 256 at 10-11. According to Plaintiffs, because XTO engaged in self-dealing with its affiliate to provide these services and allowed the affiliate to charge "more than could be justified under a cost-of-service approach[,]" XTO did not perform in good faith. ECF No. 256 at 10-11. XTO counters that because the royalty provision allows XTO to deduct "all" post-production costs, imposing a "reasonability" requirement alters the "express language of the leases by putting limits on the deductions and subjecting those deductions to a test for which the parties never bargained." ECF No. 245 at 16. XTO maintains the discretionary clause allows XTO to choose "which companies it will contract with for gathering and processing services." *Id*. at 12.

Fundamentally, Plaintiffs' implied duty of good faith claim imposes obligations the parties did not bargain for: that transactions with affiliates be negotiated at arms-length[12] and/or that XTO may only deduct post-production costs that are "reasonably" priced. Had the parties intended to be bound by such constraints, they certainly could have included such language in their leases. *See e.g.*, *Atl. Hydrocarbon, LLC v. SWN Prod. Co., LLC*, No. 4:17-CV-02090, 2018 WL 3007536, at *2 n.13 (M.D. Pa. June 15, 2018) (if parties intended to limit affiliate transactions in oil and gas lease they could have so contracted); *Slamon*, 654 F. Supp. 3d at 421, 438 (plaintiffs could not maintain an implied duty of good faith claim for failing to obtain a competitive market price for sale of gas where lease comprehensively addressed calculation of royalties and protected against artificial low pricing methods).

The requirement to perform a contract in good faith cannot be "used to override the parties' agreement for reasons of fairness, policy, or morality" and the Court will not impose such a duty here. *Quinn Constr., Inc. v. Skanska USA Bldg., Inc.*, 730 F. Supp. 2d 401, 409 (E.D. Pa. 2010) (applying Pennsylvania law); *see also* Restatement (Second) of Contracts § 205 comment d.; *Mack Trucks Inc. v. BorgWarner Turbo Sys., Inc.*, 508 F. App'x 180, 186 (3d Cir. 2012); *Krauss v. M. L. Claster & Sons, Inc.*, 254 A.2d 1, 3 (Pa. 1969) ("In an action at law, the reasonableness of any given contractual term simply is not relevant."); *Simeone v.*

---

[12] "Arms-length" has been defined as "referring to the situation in which two or more parties, acting independently and in their own economic interests, agree to do business with one another." *Slamon*, 2024 WL 4602673, at *6.

*Simeone*, 581 A.2d 162, 165 (Pa. 1990) (traditional principles of contract law forbid judicial review of the reasonableness of contractual terms).

Courts that have addressed the propriety of post-production costs deducted from oil and gas royalties under Pennsylvania law have, in general, only found actionable conduct when the post-production costs are not actually incurred rather than when a party alleged breached a lease because the fees were, in their view, unreasonable. *See Mun. Auth. of Westmoreland Cnty. v. CNX Gas Co., L.L.C.*, 380 F. Supp. 3d 464 (W.D. Pa. 2019) (breach of contract recognized when fees were charged under oil and gas lease that were not incurred); *Ohio Valley Energy Sys. Corp. v. DL Res., Inc.*, No. CV 15-29, 2016 WL 7107972, at *11 (W.D. Pa. Dec. 5, 2016) (implied breach of good faith recognized when fees were charged under oil and gas operator agreements that were not incurred); *Pollock v. Energy Corp. of Am.*, 665 F. App'x 212 (3d Cir. 2016) (jury verdict for breach of contract affirmed where producer exclusively sold gas to its affiliate and then deducted marketing costs from royalties that were incurred by the affiliate in connection with selling the gas to third parties because "[m]anifestly, there were no marketing costs involved" in the sale between the producer and its affiliate).

For example, in *Westmoreland Cnty. v. CNX Gas Company, LLC*, the court found there was sufficient evidence that CNX deducted post-production costs from royalties it did not incur when it imposed a "blended" gathering rate for "wet" and "dry" gas which was formulated by averaging the costs to gather both  "wet" and "dry" gas, when the County's wells did not produce any wet gas. 380 F. Supp. 3d at

31

475.    The court reasoned if CNX was going to reduce the amount of "royalties [paid] by assessing a pro rata share of a particular category of post-production costs . . . at the very least that *category* of costs must have actually been incurred with respect to gas produced under the Lease." *Id.* (emphasis in original).[13]

Similarly, in *Ohio Valley Energy Sys. Corp.*, the court found questions of fact existed as to whether one party to an oil and gas operator agreement "evaded the spirit of the bargain" and breached the implied duty of good faith when it continued to charge operating fees for non-operational wells, *i.e.*, charged for fees it did not incur. *Ohio Valley Energy Sys. Corp.*, 2016 WL 7107972, at *11.

Borrowing from these courts' reasoning, Plaintiffs attempt to argue that XTO did not actually incur the gathering and processing charges Mountain Gathering assessed under the Gas Gathering Agreement. ECF No. 256 at 10.  In doing so, Plaintiffs argue XTO did not incur the costs as "a matter of economics" because "XTO owned Mountain Gathering.  XTO essentially paid itself when it paid Mountain Gathering. . . . The proverbial hand passed the money from the right pocket to the left." ECF No. 256 at 10.  By advancing this argument, Plaintiffs attempt to inject an entirely new cause of action to their "unreasonable deductions" implied good faith claim: that XTO deducted costs from royalties it did not actually

---

[13]    *CNX* also discussed another issue relevant in this case: non-arms-length affiliate transactions for providing post-production services. The court did not find it was a separate breach of contract or otherwise for CNX to transact with an affiliate to provide post-production services, rather the nature of the relationship between the affiliates could inform whether the "blended" rate charged was improper. *Mun. Auth. of Westmoreland Cnty.*, 380 F. Supp. 3d at 475.

incur and thus breached an express lease provision.  It is undisputed the gas under the Plaintiffs' leases was gathered and processed and thus subject to the category of costs incurred and there is no evidence of fraudulent or sham transactions.[14] *See* ECF No. 256 at 1 (Plaintiffs maintain "[t]here is no dispute that the gas produced under the oil and gas leases of the class members has to be gathered . . . and then processed.").  Notwithstanding there is no evidence to support a claim that XTO did not incur the gathering and processing costs, Plaintiffs' new theory was not pleaded nor certified for class treatment and is not properly before the Court. *Pinson v. United States*, 826 F. App'x 237, 241 n.10 (3d Cir. 2020) (plaintiff may not amend complaint through brief in opposition to a summary judgment motion).

Although foreclosed for the reasons previously given, Plaintiffs also claim that the Pennsylvania Supreme Court's benchmark oil and gas royalty decision in *Kilmer* supports its implied duty claim.  Plaintiffs argue *Kilmer* stands for the proposition that "a gas company cannot deduct charges that it does not actually incur" and because XTO is "charging higher costs than it is actually incurring [it] is liable for the difference under *Kilmer*." ECF No. 256 at 9. *See also* ECF No. 256 at 10 (Plaintiffs argue "XTO could only deduct reasonable amounts – its costs-of-service, and plaintiffs may recover the difference" and citing *Kilmer* as authority).

---

[14]    Plaintiffs simply rely on the conclusive testimony from their expert Barry Pulliam who hypothesized XTO did not incur any post-production costs simply due to the affiliate relationship between it and Mountain Gathering.  Mr. Pulliam speculated "[s]ince XTO owns 100 percent of Mountain Gathering, the rates XTO pays to Mountain Gathering are effectively paid to itself." ECF No. 254 at 4 ¶ 11.   "An expert report that merely offers conclusory opinions, without explicit factual foundation, is insufficient to defeat a motion for summary judgment." *Marvel v. Delaware Cnty.*, No. CIV A 07-5054, 2009 WL 1544928, at *17 (E.D. Pa. June 2, 2009), *aff'd sub nom. Marvel v. Cnty. of Delaware*, 397 F. App'x 785 (3d Cir. 2010) (cleaned up).

33

*Kilmer* was a statutory construction case that decided whether Pennsylvania law precluded the parties from contracting to use the net-back method to deduct post-production costs from royalties in oil and gas leases. *Kilmer*, 990 A.2d 1147, 1151 (Pa. 2010). In *dicta*, the court addressed the lessor's concern that gas producers could inflate their costs to drive royalties down. In an apparent attempt to assuage this concern, the court stated: "If a landowner suspects that a gas company is charging higher costs than the gas company is actually paying, then the landowner can seek a court ordered accounting." *Kilmer*, 990 A.2d at 1158.

Plaintiffs' characterization that post-production costs must be "reasonable," and the *dicta* above in *Kilmer* imposes a "reasonability" requirement for setting prices for post-production costs is an overreach. *Kilmer* simply stands for the proposition (if any) that if lessors believed they were charged for expenses not actually incurred, they could seek an accounting from the Court. In the post-*Kilmer* landscape, disputes involving the propriety of post-production costs turn on whether the costs were actually incurred due to the fact-specific characteristics of the gas, the nature of production or the nature of the sale. *See supra* at pp. 31-32. Plaintiffs have cited to no case,[15] and this Court has independently found none, which stand

---

[15] Plaintiffs do however, make the sweeping proposition that all gas producing states impose a general reasonableness requirement in setting fees and offer a string cite of cases with no context or analysis. ECF No. 256 at 3 ("gas producing states uniformly hold that post-production deductions must be reasonable . . . . Each of these states requires post-production deductions to be reasonable, especially in an affiliate situation."). While federal courts are empowered to apply state substantive law under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts "must proceed with caution in making pronouncements about state law." *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092 (7th Cir. 1999); *Toyo Tire Corp. v. Atturo Tire Corp.*, No. 2022-1817, 2024 WL 4404358, at *10 (Fed. Cir. Oct. 4, 2024), *cert. denied,* 145 S. Ct. 2750 (2025) (same). Without more analysis, the Court is reluctant to make such a sweeping conclusion that all states impose a general "reasonableness"

for the proposition that *Kilmer* imposes a general reasonable pricing standard for setting post-production costs and this Court declines to extend *Kilmer* to so find.

A final point worthy of discussion is that XTO was granted the sole discretion to determine how to produce and sell the gas under the leases, and the implied duty of good faith "may also be breached when a party exercises discretion authorized in a contract in an unreasonable way." *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 513 (E.D. Pa. 2012) (applying Pennsylvania law). Though Plaintiffs do not outright argue this point, because they allude to XTO's discretion under the lease, *see* ECF No. 256 at 7 (positing XTO does not have "unfettered discretion to deduct any amount for post-production costs"), this topic is addressed to provide a complete analysis of Plaintiffs' implied duty of good faith claim.

Just as the implied duty of good faith cannot impose a term in the contract not negotiated for, the implied covenant also cannot change the express terms of the contract. *Montanez*, 876 F. Supp. 2d at 515. The Court characterizes Plaintiffs' position as: XTO exercised its discretion unreasonably when it transacted with an affiliate to provide post-production services and did not negotiate costs for post-

---

requirement for determining pricing for post-production costs and that Pennsylvania should adopt the same requirement and apply it to this matter. *See In re Generac Solar Power Sys. Mktg., Sales Pracs., & Prods. Liab. Litig.*, 735 F. Supp. 3d 1047, 1058 (E.D. Wis. 2024) (likening this to a "drive-by *Erie* guess for each state."). *See also Colgan v. Forest Oil Co.*, 194 Pa. 234, 240, 45 A. 119 (Pa. 1899) ("There is no relation of special trust or confidence between lessor and lessee in gas or oil leases, any more than in any other. Like all other contracting parties, they deal at arm's length, each for his own interest. So long as the question is one of business judgment and management, the lessee is not bound to work unprofitably to himself for the profit of the lessor; and the parties must be left, as in other cases, to their own ways. It is only when a manifestly fraudulent use of opportunities and control is shown that courts are authorized to interfere.").

production services at arms-length and charged above-market amounts for gathering and processing services. *See* ECF No. 79 at ¶¶ 62, 94. Such a claim fails because as discussed *supra* it imposes contractual terms that were not bargained for: requiring arms-length negotiations and market-pricing for post-production services resulting from affiliate transactions. *See John B. Conomos, Inc. v. Sun Co. (R&M)*, 831 A.2d 696, 706-07 (Pa.Super.Ct. 2003); *Atl. Hydrocarbon, LLC*, 2018 WL 3007536, at *2 n.13.[16]

In summary, Plaintiffs' implied duty of good faith claim imposes contractual terms the parties never agreed to and must fail as a matter of law. Accordingly, XTO's remaining arguments are not addressed, and it is respectfully recommended that the Court enter judgment in favor of XTO on Count II.

### 2. Count III: Deductions Made after Gas is Marketable

In Count III, Plaintiffs maintain the Phillips Market Enhancement Clause leases only permit deductions of post-production costs from royalties incurred before the product is transformed into marketable form. ECF No. 256 at 14. According to Plaintiffs, because XTO deducted transportation and fractionation costs from royalties after two gas products, residue gas and NGLs, were in marketable form, it

---

[16]    Relatedly, Plaintiffs argue if XTO is permitted "unfettered discretion to charge whatever it wishes for gathering and processing gas in Butler County" it could charge "$0.30/Mcf for processing, $3.00/Mcf for processing, $30.00/Mcf for processing, or $300/Mcf for processing at its whim without ever having to justify its choice[.]" ECF No. 256 at 4. One would speculate if XTO set post-production costs for the sole purpose of evading its royalty obligations, or set prices through sham or fraudulent transactions, such conduct could be actionable under an implied duty of good faith claim. But it remains that parties cannot rely on the implied duty of good faith to impose obligations the parties did not agree to nor adjudicate the issue presented here: whether the terms are fair. *Quinn Constr, Inc.*, 730 F. Supp. 2d at 409.

breached the leases. ECF No. 256 at 14.  The Phillips Market Enhancement Clause lease provides:

> MARKET ENHANCEMENT. Notwithstanding anything to the contrary contained herein, it is agreed between the Lessor and Lessee that all oil and gas royalties accruing to the Lessor under this lease shall be net of Lessor's proportionate share of the cost of gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas or other products produced hereunder to transform the product into marketable form.

*Id*.  Plaintiffs maintain residue gas is in marketable form at the tailgate of the processing plant because it "does not change after it exits the processing plant until it is eventually sold." *Id*. at 17.  Plaintiffs also maintain the NGLs are in marketable form at the tailgate of the processing plant because they do "not change form between the tailgate (end) of the processing plant and the adjacent inlet flange for MarkWest's pipeline at or near the processing plant." *Id*. at 17-18. *See also supra* pp. 3-6 (explaining the production process for residue gas and NGLs).  In other words, Plaintiffs maintain because both residue gas and NGLs are in the same physical form after being processed as they are when they are sold downstream, the gas products are in "marketable form" at the tailgate of the PennCryo or Bluestone processing plants. *Id*. at 17.  Thus, according to Plaintiffs, XTO could not deduct post-production costs from royalties which are incurred after the gas leaves the tailgate of the processing plant. *Id*.

While Plaintiffs do not explicitly provide the legal basis for their Count III claim, it is clear they are alleging an express breach of contract claim.[17]  The gravamen of Count III is as follows: (1) the leases allowed deductions of post-production costs from royalties only until the gas products are marketable, (2) XTO breached that provision when it deducted post-production costs from royalties after the gas products were marketable, and (3) they are entitled to a return of those deductions as damages. ECF No. 256 at 14 ("Plaintiffs agree that the post-production expenses listed in the Market Enhancement clause can be deducted from their royalty payments if they are incurred before the product is transformed into marketable form.  The dispute is whether such post-production costs can be deducted if they are incurred after the product is transformed into marketable form."). *See also Jedlicka*, 42 A.3d at 267.

XTO argues it is entitled to summary judgment on this claim for two main reasons: (1) both Pennsylvania law and the leases permit the deductions; and (2) there is no evidence XTO could sell NGLs or residue gas at the tailgate of the processing plants nor is there any evidence that these gas products were in "marketable form" at the tailgate of the processing plant. ECF No. 245 at 21.

Plaintiffs generally respond that in the gas industry, the concept of "marketable form" requires gas be in a "physical condition so that it can be

---

[17]   While Plaintiffs' operative complaint mentions the duty of good faith in connection with this claim, Plaintiffs have provided no legal basis to consider a separate breach of the implied duty of good faith claim with respect to Count III and the parties treat Count III as an express breach of contract claim. *See* ECF No. 79 at ¶ 99.  Therefore, the Court will only consider an express breach of contract claim and provides no analysis with respect to any implied duty that may apply.

exchanged in a commercial market" and it "must be in a location where the gas is commercially saleable." ECF No. 256 at 15.  Plaintiffs urge the Court to adopt the definition of "marketable form" implemented by the Court of Appeals for the Fourth Circuit: "a product is 'marketable' when it is 'able or fit to be sold or marketed.'" *Corder v. Antero Res. Corp.*, 57 F.4th 384, 399 (4th Cir. 2023).  Plaintiffs also urge the Court to find that the eventual point of sale is not *ipso facto* when gas is in marketable form, because a gas product may reach a marketable form some time before the point of sale. ECF No. 256 at 15-16 (citing *Corder*, 57 F.4th at 399).  The Court will first consider the arguments related to lease interpretation as a threshold matter, and then consider whether there is any evidence to support a breach.

### a.  Lease Interpretation

An oil and gas lease is controlled by the principles of contract law and "must be construed in accordance with the terms of the agreement as manifestly expressed[.]" *Jedlicka*, 42 A.3d at 267.  "The accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." *Id.* (cleaned up).  The heart of contract interpretation is whether the terms at issue are ambiguous or unambiguous.  A term is unambiguous if it is "reasonably capable of only one construction." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997).  A term is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison*

*v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986).  If the term is ambiguous, the parties may use extrinsic evidence "to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances." *Id.* (cleaned up).

The Phillips Market Enhancement Clause provides in pertinent part: "all oil and gas royalties accruing to the Lessor under this lease shall be net of Lessor's proportionate share of the [post-production costs] . . . to transform the product into marketable form." ECF No. 256 at 14.  The operative terms "shall be net," "transform" and "marketable form" are not defined by the leases.  "If left undefined, the words of a contract are to be given their ordinary meaning." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).  Courts may use dictionary definitions to give terms their "ordinary meaning" or may consider how a term is used or defined in the relevant industry or trade. *Slamon*, 654 F. Supp. 3d at 425.  Specifically,

> In the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract. If words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words.

*Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001).  It is commonly understood in the oil and gas industry that a "market enhancement clause" is "a clause in the royalty provision of an oil and gas lease that deals with the issue as to whether a lessee may use the netback method to calculate royalties

owed." Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law*, § M p. 591 (LexisNexis Matthew Bender 2025).

Both Plaintiffs and XTO argue that these terms are unambiguous but ascribe different meanings to the royalty provision. "A contract is not rendered ambiguous merely because the parties dispute its proper construction." *Slamon*, 654 F. Supp. 3d at 424 (applying Pennsylvania law). Thus, simply because the parties define the terms differently does not make the Phillips Market Enhancement Clause ambiguous.

Plaintiff interprets the royalty provision as only allowing XTO to deduct post-production costs "if they are incurred before the product is transformed into marketable form." ECF No. 256 at 14. By contrast, XTO interprets the "shall be net" language of the royalty provision as expressly authorizing XTO to use the net-back method to calculate royalties. ECF No. 245 at 26-28. XTO argues this language, read in conjunction with the "transformed into marketable form" language, allows XTO to deduct post-production costs incurred after the products become marketable to enhance the products' value. ECF No. 245 at 26-28. Neither party argues that the Court should use extrinsic evidence to define these terms outside of their ordinary meanings. Rather, Plaintiffs argue the Court should adopt a definition of "marketable form" that has been applied by courts in other jurisdictions, while XTO argues it is apparent from the four corners of the leases that the net-back method for calculating royalties applies. ECF No. 256 at 15-16; ECF No. 262 at 10-11.

The terms included in the Phillips Market Enhancement Clause are unambiguous and capable of only one reasonable construction: it allows XTO to deduct post-production costs incurred up to the point of sale using the net-back method regardless of when the gas reaches marketable form. The lease expressly allows XTO to deduct post-production costs from royalties as the "net" of Plaintiffs' proportionate share of those costs. The parties do not appear to dispute this definition. In the oil and gas industry, a royalty provision like the Phillips Market Enhancement Clause here that calculates royalties based on a lessor's pro-rata share of post-production costs is commonly understood to calculate royalties under the "net-back method." *Kilmer*, 990 A.2d at 1149; 30 C.F.R. § 206.151; Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law*, § N pp. 655-656 (LexisNexis Matthew Bender 2025).

Under the net-back method, the fair market value of the gas produced under the lease is calculated by deducting post-production costs "from the proceeds received for the gas . . . at the first point at which reasonable values for any such products may be determined by a sale pursuant to an arm's-length contract or comparison to other sales of such products, to ascertain value at the lease." *Kilmer*, 990 A.2d at 1149 n.3 (quoting 30 C.F.R. § 206.151). *See also* Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law*, § N pp. 655-56 (LexisNexis Matthew Bender 2025) (explaining under the net-back method, "valuation is determined by taking the downstream sales price and deducting from it the costs incurred by the working interest owner . . . to move the gas from the point of

valuation to the actual point of sale."). Thus, under the net-back method set forth in the leases, XTO is allowed to deduct post-production costs from royalties incurred before the point of sale.

Plaintiffs argue interpreting the leases to allow deductions at the point of sale would "not give effect to the words, 'to transform the product into marketable form.'" ECF No. 256 at 16. They urge the Court to interpret this phrase to mean XTO could not deduct post-production costs incurred after the products were transformed into marketable form. *Id*. at 16-17. "In construing a contract, [a court] must give effect to all of the provisions therein. An interpretation will not be given to one part of the contract which will annul another part of it." *Mitch v. XTO Energy, Inc.*, 212 A.3d 1135, 1139 (Pa.Super.Ct. 2019). That said, a contract can only be interpreted as written and a court cannot "modify the plain meaning under the guise of interpretation." *Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 665 (Pa.Super.Ct. 2014) (cleaned up).

The Court agrees with Plaintiffs that the phrase "transform the product into marketable form" must be given meaning, but disagrees this phrase requires XTO to only deduct post-production costs incurred until the product reaches marketable form. The phrase "to transform the product into marketable form" must be read in conjunction with the remainder of the clause: royalties "shall be net" of Plaintiffs' share of post-production costs to transform the product into marketable form. Plaintiffs instead whittle out the language "to transform the product into marketable form" to modify the plain language of the lease and impose a

43

requirement that XTO may not make deductions after the gas is marketable.  Had the parties intended to impose such a restriction, the Market Enhancement Clause could have stated, for example, that deductions were permitted "until the product is transformed into marketable form."  The only language requiring, or conditioning royalty payments is the phrase that royalties "shall be net" of Plaintiffs' proportionate share of costs.  The "to transform the product into marketable form" phrase appears after a laundry list of post-production costs and merely describes why those costs are incurred.  Interpreting the phrase "to transform the product into marketable form" as only allowing deductions until the product is marketable would render the "shall be net" language meaningless.  Instead, giving the entire provision meaning, the only reasonable interpretation is that XTO may use the net-back method to calculate royalties by deducting Plaintiffs' proportionate share of post-production costs including those costs which enhance the products' value for sale.

Finally, Plaintiffs urge the Court to adopt definitions of "marketable form" applied by two federal appellate courts included in market enhancement clauses. ECF No. 256 at 17.  Plaintiffs cite *Corder*, 57 F.4th 384 and *The Grissoms, LLC v. Antero Res. Corp.*, 133 F.4th 605 (6th Cir. 2025) for the proposition that the term "marketable form" does not mean "point of sale" and post-production costs can only be deducted until the product is transformed into "marketable form." ECF No. 256 at 15-17.

Before addressing this argument, the Court finds it necessary to first provide some clarifying context. Some states have adopted a principle of royalty calculation referred to as the "first-marketable" or "marketable product rule" that where a lease is ambiguous or silent as to allocation of post-production costs, gas producers must incur all costs to make the gas marketable. Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law*, § F pp. 387-88 (LexisNexis Matthew Bender 2025). *See also Kilmer*, 990 A.2d at 1155 (noting Colorado, Oklahoma, Kansas and West Virginia have adopted this doctrine). Therefore, in these jurisdictions, gas producers may not deduct post-production costs from royalties that are incurred to make the gas "marketable." Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law*, § M pp. 588-90 (LexisNexis Matthew Bender 2025). What is considered "marketable" in each jurisdiction differs, but the rule generally provides gas becomes "marketable" when it is in such a physical form and location that it is capable of a sale. *See Est. of Tawney v. Columbia Nat. Res., L.L.C.*, 633 S.E.2d 22, 28 (W.Va. 2006) (West Virginia law); *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 900 (Colo. 2001) (Colorado law); *Sternberger v. Marathon Oil Co.*, 894 P.2d 788, 795 (Kan. 1995) (Kansas law); *Wood v. TXO Prod. Corp.*, 1992 OK 100, ¶ 9, *as corrected on reh'g* (May 24, 1993) (Oklahoma law).

Similarly, some oil and gas leases explicitly provide for a marketable product rule allocation of costs and may contain a "Market Enhancement Clause" to that effect. These clauses generally state no deductions can be made from royalties to make the gas marketable, but gas producers are permitted to deduct post-

production costs expended to enhance the value of the already-marketable gas, *e.g.*, further refinement or transporting further downstream to obtain a higher price. Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law*, § M pp. 591-92 (LexisNexis Matthew Bender 2025).  Litigation involving these Market Enhancement Clauses usually concerns the issue of when the gas is transformed into its "first marketable product," because that is the first point gas producers can deduct costs from royalties. *See e.g.*, *Corder*, 57 F.4th 384; *The Grissoms, LLC*, 133 F.4th 605.  Gas producers usually ask courts to find the gas is marketable earlier in the production process, and lessors ask the opposite, so each lessen their own burden of sharing the costs. *See ibid*.

Plaintiffs' theory of liability regarding "marketable form" seems to rest on principles borrowed from the first-marketable product rule jurisdictions or cases involving lease provisions that do not allow deductions from royalties before the gas is marketable, instead of net-back principles which expressly applies to the royalty provision here.  Plaintiffs' theory appears to elevate form over substance by implying that merely labeling the royalty provision as a "Market Enhancement Clause" triggers the application of the first marketable product rule.  But, as discussed, the substance of the Phillips Market Enhancement royalty clause expressly permits calculating royalties based on the net share of all post-production expenses.  Simply because the provision uses the phrase "to transform the product into marketable form" does not transform it into the operative phrase mandating royalty payments.  It is instead a description of why the post-production costs are

incurred.  Indeed, even in situations when no deductions are permitted until the product becomes marketable under the express provisions of a Market Enhancement Clause or in first-marketable product rule jurisdictions, deductions are still permitted for costs incurred after the gas is marketable until the point of sale using a net-back calculation. Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law*, § M pp. 591-92 (LexisNexis Matthew Bender 2025).  With that background in mind, the Court will now address Plaintiffs' request to apply the definition of "marketable form" set forth in *Corder* and *The Grissoms* to this matter.

In *Corder* and *The Grissoms*, the courts were tasked with interpreting the royalty provisions of oil and gas leases under West Virginia and Ohio law, respectively.  In both cases, the leases contained identical royalty provisions that **did not** permit deductions of post-production costs from royalties "to transform the product into marketable form" but allowed deductions for costs that enhanced the value of the already-marketable gas to receive a higher sale price.[18] *The Grissoms, LLC*, 133 F.4th at 609; *Corder*, 57 F.4th at 398.

---

[18]    The Market Enhancement Clauses in *The Grissoms* and *Corder* were identical and stated in full:

C) Market Enhancement Clause. It is agreed between the Lessor and Lessee that, notwithstanding any language contained in A) and B) above, to the contrary, all royalties or other proceeds accruing to the Lessor under this lease or by state law **shall be without deduction** directly or indirectly, **for the cost** of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder **to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be proportionally deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such**

In the instant matter, the Phillips Market Enhancement Clause is the *The Grissoms* and *Corder* leases in reverse: the Phillips Market Enhancement Clause affirmatively allows deductions of post-production costs to make the gas marketable.  And Plaintiffs attempt to apply the reasoning of *The Grissoms* and *Corder* in reverse – those leases **only** allowed deductions for post-production costs incurred **after** the gas was already in marketable form to enhance its value; here, Plaintiffs argue the leases allow deductions for post-production costs **until** the gas is in marketable form.  Plaintiffs do not attempt to reconcile these differences.  *The Grissoms* court was careful to point out the lease in question did not use "at the well-head" or equivalent language and thus did not adopt a net-back method for calculating royalties. *The Grissoms, LLC*, 133 F.4th at 611–12.  Given the inherent dissimilarities between the leases at issue, and that those courts were analyzing the lease language within the purview of the first-marketable product doctrine, the Court is not convinced the phrase "marketable form" in the Phillips Market Enhancement Clause is susceptible of the same meaning ascribed in *The Grissoms* and *Corder*.

The lease unambiguously allows XTO to use the net-back method and calculate Plaintiffs' royalties by deducting their proportionate share of post-production expenses incurred prior to sale, including those costs that enhance the value of the products.  It is undisputed that XTO calculated royalties within this

---

**enhancements**. However, in no event shall Lessor receive a price per unit that is less than the price per unit received by Lessee.

*The Grissoms, LLC*, 133 F.4th at 609 (emphasis added); *See also Corder*, 57 F.4th at 390.

framework. *Compare* ECF No. 244 at ¶¶ 18-21 *with* ECF No. 255 at ¶¶ 1, 6-7. Accordingly, it is recommended the Court grant XTO's motion for summary judgment on Count III.

### b.  Evidence of "Marketable Form"

Even if the Court were to adopt Plaintiffs' definition of "marketable form" and find the leases do not permit XTO to deduct costs after gas is in the physical condition and in a location where it is commercially saleable, ECF No. 256 at 15, Plaintiffs' claim would still fail for a lack of evidence.  XTO is correct there is no evidence supporting Plaintiffs' assertion that either the residue gas or the NGLs are marketable at the tailgate of the processing plant.  Plaintiffs' theory rests on the presumption that once the gas product reaches a physical form capable of being sold, it is in "marketable form."  It appears undisputed that the residue gas and the NGLs do not undergo any further processing which alters their physical form after the products leave the processing and/or fractionation plant.  However, even under Plaintiffs' definition, this is only half of the equation because the gas products must also "be in a location where the gas is commercially saleable." ECF No. 256 at 15. Plaintiffs' theory would have the Court instead find that no further deductions can be made after the gas is processed – a term not in the lease and inconsistent with Plaintiffs' own definition of "marketable form."  Moreover, Plaintiffs have offered no evidence that the tailgate of the processing plant is a location or "market in which either the residue gas or NGLs are capable of commercial sale."[19]

---

[19]   It is undisputed that Plaintiffs' experts offered no opinion on when or where the gas is in marketable form. *Compare* ECF No. 244 at ¶¶ 51-52 *with* ECF No. 255 at ¶¶ 1, 18.

In an attempt to demonstrate the NGLs alone are capable of sale at the tailgate of the processing plant, Plaintiffs point to an agreement between XTO and MarkWest. ECF No. 256 at 18. In this agreement, MarkWest takes title to the unfractionated NGLs at the inlet of the fractionation facility in return for payment to XTO. ECF No. 256 at 18. While not readily apparent, it appears Plaintiffs argue the agreement shows there was either (1) an available market for the NGLs at the tailgate of the processing plant, or (2) this agreement constitutes an actual sale of the NGLs to MarkWest. As for the first argument, this agreement alone does not support the position there is a commercial market for the sale of the gas products and it simply shows a title transfer for processing purposes. The agreement alone does not support the position that MarkWest or any other company was able to buy the gas at the tailgate. As for the second argument, there is no evidence that XTO sold NGLs to MarkWest or that this agreement constitutes such a sale. Plaintiffs' own expert characterizes this agreement "served to provide fractionation services to XTO for its raw make NGL stream." ECF No. 255-1 at p. 116 ¶ 27. It is instead undisputed that the gas products are sold downstream and XTO does not incur or deduct any post-production costs from royalties after the gas is sold. *Compare* ECF No. 244 at ¶¶ 18-21 *with* ECF No. 255 at ¶¶ 1, 6-7. Because Plaintiffs have not provided even a scintilla of evidence that there is a market – either at the tailgate of the processing plants or at any point prior to the actual sales – in which either the residue gas or NGLs are capable of commercial sale, Plaintiffs' claim under Count III must fail for this separate reason and it is respectfully recommended that the

Court grant XTO's motion for summary judgment for Count III. *See Anderson*, 477 U.S. at 252.

### iii. Motions to Exclude Expert Testimony ECF Nos. 246, 248, 250, 252

Because it is recommended the Court grant summary judgment in favor of XTO for all remaining claims, it is further recommended the pending motions to exclude expert testimony be denied as moot.

### III.    Conclusion

Based on the above, it is respectfully recommended the Court deny Plaintiffs' motion for summary judgment, grant XTO's motion for summary judgment in its entirety and deny all pending challenges to expert testimony as moot.

Therefore, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), Federal Rule of Civil Procedure 72, and the Local Rules for Magistrates, the parties have until **February 26, 2026** to object to this report and recommendation.  Unless otherwise ordered by the District Judge, responses to objections are due fourteen days after the service of the objections.  Failure to file timely objections will waive any appellate rights. *Brightwell v. Lehman*, 637 F.3d 187, 193 n.7 (3d Cir. 2011).


Dated: February 12, 2026                              Respectfully submitted,

                                                      s/ Christopher B. Brown
                                                      United States Magistrate Judge


cc:    Honorable William S. Stickman IV
       United States District Judge
       *via electronic filing*

Counsel of record
*via electronic filing*